United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LUISA GONZALES, et al.,

       Plaintiffs,

  v.

TEXACO INC., TEXACO PETROLEUM
COMPANY, INC., and CHEVRON
CORPORATION,
_____/

No. C 06-02820 WHA

**RULE 11 SANCTION AND
AWARD OF ATTORNEY'S
FEES AND EXPENSES
AND JUDGMENT LIEN**

## INTRODUCTION

The ultimate question is who should bear the expense incurred by the defense in demonstrating that the cancer claims of three plaintiffs herein were baseless. Every incarnation of the complaint herein alleged that plaintiffs Gloria Chamba, Nixon Rodriguez, Luisa Gonzales had contracted cancer (or represented a family member that had contracted cancer) from the Ecuador oil operations of defendants Texaco Inc., Texaco Petroleum Company, Inc., and Chevron Corporation. Depositions eventually proved this claim to be false — they concededly have never had cancer at all — and their claims were dismissed. On its own initiative pursuant to Rule 11(c)(1)(B), the Court issued an order to show cause, held a hearing, allowed supplementation, and will now impose sanctions. This order holds that plaintiffs' counsel did not reasonably and competently investigate whether these plaintiffs actually had cancer before filing suit. This order is without prejudice to the claims of the two remaining plaintiffs, who may (or may not) have meritorious claims.

**United States District Court**
For the Northern District of California

This Court has considerable respect for public interest lawyers and the important work they do. Nonetheless, all counsel, including public interest lawyers, must obey the standards of practice before our United States District Courts. When counsel fall demonstrably below those standards, as here, it would be unfair to excuse the shortfall based on generalized good intentions. The sad fact is that counsel's haste to sue and lassitude in investigation imposed a real and unnecessary burden on defendants, our judicial system and, truth be told, the three plaintiffs, who never even realized litigation would be brought in their name in the United States.

**STATEMENT**

This case is the third in a series of lawsuits brought by Attorney Cristobal Bonifaz against Texaco/Chevron. The basic point of contention is whether or not Texaco/Chevron's oil drilling operations in Ecuador have polluted water sources used by the indigenous people and whether this has inflicted cancer upon them. As to any individual who actually has cancer, these claims must be taken seriously. Plaintiffs' counsel, however, have included in this case at least three individual plaintiffs who, it turns out, have never had cancer. As stated, the question presented is who should bear the burden incurred by defendants in demonstrating the cancer claims of these three plaintiffs were baseless. The Court makes the following findings.

**1.    PRIOR LITIGATION: THE LAGO AGRIO CASE.**

Although there are several counsel of record for plaintiffs, Attorney Cristobal Bonifaz has been the lead and the moving force behind this litigation involving residents of Ecuador. He is a native of Ecuador and a member of the bar of Massachusetts. He was involved in two earlier Ecuador-based water-contamination cases against Texaco/Chevron. In 1993, he filed a class action for Ecuador residents in the Southern District of New York. The case was dismissed on grounds of *forum non conveniens*, with the condition that Texaco/Chevron agree to litigate in Ecuador. The decision was affirmed on appeal. *See generally Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

In May 2003, Attorney Bonifaz, along with Ecuador counsel, recommenced the case in Ecuador, which became known as the Lago Agrio case and is still ongoing (Aug. 9 Rector

United States District Court
For the Northern District of California

Dec. Exh. 1).  The Amazon Defense Front ("Frente") was designated trustee in charge of administering any judgment.  Attorney Bonifaz represented the organization until last year (Aug. 9 Rector Decl. Exh. 5).  In a resolution dated February 17, 2006, the executive committee of Frente terminated Attorney Bonifaz.  The resolution stated that Attorney Bonifaz's actions "in the last few years have been unilaterally decided and personal" and constituted "more than a grave lack of respect but a violation of [Frente's] internal decision-making processes with respect to the legal process, which has created a feeling of distrust in the directors and the legal team members alike" (Aug. 9 Rector Decl. Exh. 6).

**2.      LITIGATION AGAINST TEXACO IN OUR DISTRICT.**

Attorney Bonifaz then commenced this competing action here in the Northern District of California, which developed as follows.  In a January 2006 letter to his friend Gerardo Pena Mateus in Ecuador, Attorney Bonifaz requested that Mr. Mateus help him obtain, according to the letter:  (i) three or four people who lived close to the petroleum lakes left by Texaco and who had discovered they had cancer; (ii) a letter from Dr. Ribadeneira[1] or other medic who had examined these people and could confirm that there was "at least a 51% probability" that the cancer had been caused by petroleum contamination; and (iii) authorization from these people for Mr. Mateus to seek court relief in their names.  In that same letter, Attorney Bonifaz wrote, "It is possible that with this last action in court that I am planning we will give Chevron 'la copa de gracia'" (June 15 Rector Decl. Exh. 1).  There was no express reference in the letter to suing in the United States rather than in Ecuador and it is not clear when Attorney Bonifaz settled on the strategy of suing in the United States.

Attorney Bonifaz and Mr. Mateus prepared a one-page intake form to gather information from prospective plaintiffs.  In January 2006, Attorney Bonifaz commissioned Mr. Mateus' paralegal, Teresa Gallo, in Ecuador "to contact poor indigent residents of the rainforest who [were] now discovering that they [had] been injured by years of exposure to Texaco's pollution, because either they or their close relatives [were] now contracting cancer" (Aug. 9 Rector Decl.

---

[1]  Dr. Ribadeneira's first name was not provided in the letter.

Exh. 2 at 4).  Mr. Mateus then sent the intake forms to Attorney Bonifaz.  Prior to filing suit, no counsel herein interviewed any of the three plaintiffs at issue.  In framing the complaint, counsel relied entirely on information gathered by "Ms. Teresa," as counsel call her.

### A.      Plaintiff Chamba.

Plaintiff Gloria Chamba has been a resident of the Amazon rainforest region for over twenty years.  She was interviewed by Ms. Teresa on behalf of Plaintiff Chamba's son, who the complaint eventually alleged had leukemia.  In fact, her son has never had leukemia or cancer and has never been diagnosed with leukemia or cancer.

In the pre-suit interview, Ms. Teresa filled out Plaintiff Chamba's intake form as follows:

> **Where are your medical records:**  Carlos Andrada Marin Hospital
>
> **Date of the first suspicion of cancer in your body:** October 23, 2002
>
> **Date of first diagnosis of cancer:** _____

All agree that the form was for the son.  Notably, the date of first diagnosis of cancer was left blank, *i.e.,* no date of first diagnosis of cancer was recorded.  No one bothered to get the hospital records to see if leukemia had been diagnosed.  Furthermore, there was no confirmation of cancer by any doctor or other medical professional or, for that matter, express authorization to sue in the United States  (Resp. to Ct. Order Re Blank Intake Forms, Exh. 1 and 2).

At the hearing on the Rule 11 order to show cause, as the foregoing facts became clear, plaintiffs' counsel stated that the paralegal had been *verbally* told by Plaintiff Chamba that her son had leukemia.  Since this was not part of the sworn record, the Court re-opened the record and invited counsel to supplement and to provide Ms. Teresa's declaration, which had not previously been provided.  Two weeks after the hearing, the declaration was received.  In her declaration, Ms. Teresa stated, "One of the persons with whom we communicated during our stay in Lago Agrio was Mrs. Gloria Carmita Vera Chamba who assured us that she lived in a region completely contaminated by oil, that her youngest son [G.E.] had been contaminated by petroleum, and that he suffered from leukemia" (Gallo Decl. at 2).  She further stated, "On this

4

trip Ms. Chamba repeated to me a number of times the fact that her son [G.E.] suffered from leukemia" (*id.* at 3).  No contemporaneous note or other documentation was provided to corroborate the alleged verbal leukemia comment.  Nonetheless, this order assumes that Plaintiff Chamba did say to Ms. Teresa that her son had leukemia.

Effective February 1, 2006, Plaintiff Chamba signed a writing now portrayed as a "contract" of employment, although it was never signed by counsel, principally because no counsel herein bothered to meet with the client (Def. Reply to Pls. Response to Order to Show Cause Exh. 1).  Nonetheless, this order assumes the writing was a contract of employment, as contended.  It stated that Attorney Bonifaz and his business associates "agree as described in this contract to sue companies that have caused damage and injury to the client from actions relating to petroleum operations [and] agree to principally litigate so as to provide public health clinics to the client as well as all other residents who reside in the same location as the client."  The writing was half a page.  It made no reference whatsoever to any suit being brought in the United States or anywhere outside Ecuador, much less one brought in Plaintiff Chamba's name in such foreign places.  The writing did not even expressly authorize suit to be brought anywhere in her name.  Its general language might easily have been understood (or not) as extending the client's support for and cooperation with one or more lawsuits to benefit the local residents at large rather than as authorizing a specific suit in Plaintiff Chamba's name with the attendant responsibilities and liabilities of a party plaintiff.  Even if Plaintiff Chamba thought she was signing on to be a plaintiff in the ongoing Ecuador litigation, this order finds that Plaintiff Chamba had no clue that her name would be used to launch a suit in the United States and thereby subject her to the liabilities and costs she faces for the false claim.  Given the many times herein that counsel have relied on the unsophistication of plaintiffs, Plaintiff Chamba did not give knowing and informed consent for counsel to use her name to bring this suit.  No lawyer ever counseled her on the ramifications of being a plaintiff in our federal courts, on the practical litigation need to obtain a visa and funds to attend trial in America, or on the downside of

*res judicata* should the case be lost. Counsel should have known that no consent to be used as a plaintiff in the United States had been given, much less informed consent.[2]

Even crediting Ms. Teresa's recollection that Plaintiff Chamba verbally told her that her son had leukemia and assuming Ms. Teresa passed on the same comment to plaintiffs' counsel, it did not constitute a reasonable and competent inquiry into the key claim of cancer. Moreover, the Court further finds that, prior to commencing this action, counsel were aware of the following warning flags over the cancer claim: (i) the one-page intake form was the *sole* writing regarding the cancer claim, yet it left a conspicuous blank where the date of first diagnosis of cancer was supposed to have been; (ii) it made no mention of *actual* cancer or leukemia, only a mention of "suspected" cancer; (iii) there was no medical documentation that the son had cancer, much less a medical letter stating with "51% probability" that any cancer was caused by petroleum contamination as Attorney Bonifaz had requested; and (iv) Plaintiff Chamba had not given knowing and informed consent for plaintiffs' counsel to bring suit in her name in the United States. Without following up to resolve the warning flags, plaintiffs' counsel nonetheless filed the complaint in her name alleging the son had leukemia. As stated, no counsel herein interviewed, counseled, or met Plaintiff Chamba prior to commencing this action, none of which occurred until her deposition in May 2007 (Aug. 9 Rector Decl. Exh. 10 at 4).

**B.      Plaintiff Gonzales.**

Before suit, Ms. Teresa also interviewed Luisa Gonzales. Plaintiff Gonzales is forty-years-old and a resident of the Amazon rainforest region. She has never had cancer, and no

---

[2] In his declaration, Attorney Bonifaz stated:

> [P]laintiffs have no knowledge of what the world is like outside of their home region. Nor do Plaintiffs have legal knowledge of any kind, and certainly no knowledge whatsoever of statute of limitation defenses for legal actions which to them are unknown especially when they are litigated in a foreign court in a language and under norms they will ever [sic] understand. Simply put, Plaintiffs lacked the capacity to bring a claim in the United States prior to making contact with American counsel.

(Aug. 9 Rector Decl. Exh. 2 at 5).

United States District Court
For the Northern District of California

doctor has ever told her she had cancer.  Like Plaintiff Chamba, she was never interviewed by counsel herein prior to her deposition (Aug. 9 Rector Decl. Exh. 14 at 8–9).

Plaintiff Gonzales met with Ms. Teresa.  Based merely on her own "self-diagnosis," she said she had breast cancer.  On her intake form were the following responses:

> **Type of cancer**:  Breast
>
> **Date when the cancer was diagnosed**: 1 year ago
>
> **Date when it was thought that the cancer was caused by the contamination produced by Texaco:** One year ago.
>
> **How did they arrive at the conclusion that the cancer was caused by contamination**:  Because everybody says that the result of the contamination is going to kill us.  We live because we work.

(Resp. to Ct. Order Re Blank Intake Forms, Exh. 2 and 3).  Again, nothing on the form indicated a diagnosis by a doctor.  Where the form asked Plaintiff Gonzales how she arrived at the conclusion that the cancer was caused by contamination, she responded (as noted above), "Because everybody says that the result of the contamination is going to kill us."

The intake form showed no authorization to sue on Plaintiff Gonzales' behalf, nor did it inform her of what it would be used for.  She later gave conflicting answers on whether she understood the paralegal was going to sue Texaco for her for breast cancer.  This order finds that Plaintiff Gonzales was confused as to what lawsuit, if any, would be brought in her name and against whom.  The Court finds, however, that in no event did Plaintiff Gonzales understand or expect a lawsuit would be brought in her name in the United States, against Texaco or anyone else.  No one ever counseled her on the pros and cons of being a plaintiff in the United States.

Like Plaintiff Chamba, Plaintiff Gonzales signed a "contract" of employment, hers effective April 1, 2006 (Def. Reply to Pls. Response to Order to Show Cause Exh. 1).  It had the same weaknesses.  From its general language, Plaintiff Gonzales may well have thought that she was becoming an additional plaintiff in local litigation.  But nowhere was she told that she would be a named plaintiff in litigation to be commenced in the United States.  To have intelligently contemplated such a venture, she would have had to consider how she would obtain a visa to enter the United States for trial, how the travel costs would be covered, the *res judicata* effects of losing a claim, the risk of liability for court costs, the burden of putting her local life on hold

while she attended trial in the United States, and the downsides of not attending the trial, none of which was discussed with her.

Once again, the warning flags known to counsel were:  (i) there was no medical facts supporting a claim of cancer; (ii) there was no "51% probability" opinion from a medic stating that Plaintiff Gonzales had cancer, much less a "51% probability" that any cancer was caused by petroleum contamination; (iii) Plaintiff Gonzales did not give knowing and informed consent for counsel to commence action in her name in another country; and (iv) plaintiffs' counsel had never interviewed Plaintiff Gonzales prior to lawsuit.  Without resolving these issues, plaintiffs' counsel rushed ahead and commenced this action.

### C.     Plaintiff Rodriguez.

Nixon Rodriguez, the husband of Ms. Gonzales, was named as another plaintiff on the complaint.  He had been a resident of the Amazon rainforest region for over thirty years. No intake form for Plaintiff Rodriguez was obtained by counsel (Resp. to Order Re Blank Intake Forms).  Contrary to the complaint (¶ 13), he did *not* tell Ms. Teresa that he suffered from physical and emotional problems caused by defendants' operations.  Even after plaintiffs' counsel was given the post-hearing opportunity to provide supplemental information from Ms. Teresa, her declaration made no mention of Plaintiff Rodriguez or what he said during their interview and has not denied Plaintiff Rodriguez's testimony.  Ms. Teresa's son, Eduardo Gallo, who had accompanied his mother when she interviewed Plaintiff Chamba, also did not mention Plaintiff Rodriguez in his declaration.  Plaintiff Rodriguez never met with any attorneys in the case until right before his May 2007 deposition (*id.* at Exh. 17 at 4).[3]

Plaintiff Rodriguez signed the same "contract."  As before, it had only general language, was undated, and did not expressly authorize suit in the United States (Oct. 5 Collingsworth

_____

[3] No limitation was placed on a supplemental declaration by Ms. Teresa.  To the contrary, during the September 25 hearing, the Court stated:  "You let these people go up and down at the deposition about what was said to Ms. Teresa, but when it came time for Ms. Teresa to put in her declaration, she is ominously silent.  But I will give you a chance to do that anyway.  I want you to put in whatever you want . . .  The thing is this:  Whatever you're going to put in, don't say that I said it to be a page-and-a-half.  Use you're [sic] own judgment as to what is persuasive and necessary, and think about what's happened at this hearing and some of the issues that have come up as to what she said and what these people said to her and how carefully and clearly she can say it, when and to whom she passed that information on" (Tr. at 41–42).

United States District Court

For the Northern District of California

Decl. Exh. A).  As before, plaintiffs' counsel knew or should have known that Plaintiff Rodriguez had not given consent to launch a suit under his name in the United States, much less informed consent.

The following warning flags were obvious to plaintiffs' counsel:  (1) there was no intake form for Plaintiff Rodriguez; (2) there was no evidence whatsoever supporting a claim of physical and emotional injury; and (3) Plaintiff Rodriguez did not give knowing and informed consent to plaintiffs' counsel to sue in his name in the United States.  Without resolving these warning flags, plaintiffs' counsel nonetheless pushed ahead and used Plaintiff Rodriguez's name to launch their suit in the United States.

### D. Filing of the Complaint.

The complaint was filed in our district on April 25, 2006.  On all pleadings, Attorney Bonifaz has listed himself as the lead attorney and he has so acted throughout the litigation while liberally delegating roles to various other attorneys.  The original complaint was signed by California Attorney Paul Hoffman.  The complaint alleged that nine plaintiffs had contracted cancer from defendants' oil operations in Ecuador and requested disgorgement of profits caused by Texaco's alleged dumping of produced water, which ranged between $1.4 to 5.6 billion dollars (Compl. ¶ 54).  Four plaintiffs eventually dropped out of the case, leaving Plaintiffs Chamba, Gonzales, Rodriguez, and two others (whose claims are still pending).

On October 5, 2006, the Court denied plaintiffs' motion to proceed with the action using pseudonyms because (i) plaintiffs had not cited any specific threats made against them; (ii) plaintiffs did not cite any objective reasons for their fears in their declarations; (iii) the risks of living in Ecuador did not necessarily increase by virtue of plaintiffs' involvement in the litigation; (iv) plaintiffs had not sufficiently established that the need for anonymity outweighed the prejudice to defendants; and (v) the public had a legitimate right to know on whose behalf their institutions were being used.

Attorney Terry Collingsworth signed and filed a second amended complaint, with the nine plaintiffs' actual names, on October 12, 2006 (2nd Amd. Compl.).  Attorney Collingsworth is counsel with the International Rights Advocates.

With respect to Plaintiff Chamba, the pleading alleged (¶ 12):

> [Plaintiff Chamba's] son, who was seven years old, *was diagnosed with leukemia*.  As a resident of the region for over 20 years, [Plaintiff Chamba] has been continuously exposed to the carcinogenic toxins that were released, or caused to be released, by Texaco and Texpet's oil extraction operations in the Oriente. [Plaintiff Chamba]'s exposures to these toxins has caused her physical injury on a cellular and subcellular level, impairing her immune system and substantially increasing her risk of developing cancer and/or other latent diseases.  Upon information and belief, [Plaintiff Chamba] son *contracted cancer* because of his exposure to those toxins. [Plaintiff Chamba] has suffered and will continue to suffer damages that include, without limitation, emotional distress (including fear that she will contract cancer and/or other latent diseases) and medical expenses (both for her own medical monitoring and for her son's medical monitoring and treatment) . . .  [Plaintiff Chamba] *provides care to her son as he slowly deteriorates from his cancer, knowing that his condition might be treatable if there were adequate medical facilities in the region*.

The italicized language has been emphasized to isolate the baseless allegations.

The pleading also alleged the following for named Plaintiff Gonzales ( ¶ 8):

> [Plaintiff Gonzales] is now 38 years of age and *was diagnosed with breast cancer in April 2005*.  As a resident of the region for the last 33 years, [Plaintiff Gonzales] has been continuously exposed to the carcinogenic toxins that were released, or caused to be released by Texaco and Texpet's oil extraction operations in the Oriente. [Plaintiff Gonzales's] exposure to these toxins has caused her physical injury on a cellular and subcellular level, impairing her immune system and substantially increasing her risk of developing cancer and/or other latent diseases.  Upon information and belief, *her cancer* has been caused by her exposure to those toxins, and [Plaintiff Gonzales] has suffered and will continue to suffer damages that include, without limitation, pain and suffering, emotional distress, and medical expenses (for both medical monitoring and treatment).

Again, the italicized passages here are false.  Plaintiff Gonzales was never diagnosed with breast cancer by any medic.

Finally, the following false allegations were made as to Plaintiff Rodriguez (¶ 13):

> As a resident of the region for more than 30 years, [Plaintiff Rodriguez] has been continuously exposed to the carcinogenic toxins that were released, or caused to be released, by Texaco and

10

Texpet's oil extraction operations in the Oriente. [His] exposure to these toxins has caused him physical injury on a cellular and subcellular level, impairing his immune system and substantially increasing his risk of developing cancer and/or other latent diseases. Upon information and belief, [Plaintiff Rodriguez's] wife [Plaintiff Gonzales] *contracted cancer* because of her exposure to those toxins. [Plaintiff Rodriguez] *has suffered and will continue to suffer damages that include, without limitation, emotional distress (including fear that he will contract cancer and/or other latent diseases), medical expenses (both for his own medical monitoring and for his wife's medical monitoring and treatment), and loss of consortium . . .* [Plaintiff Rodriguez] *provides care to his wife as she slowly deteriorates from her cancer,* knowing that her condition might be treatable if there were adequate medical facilities in the region.

As before, the italicized language was untrue.

After this action was well underway, Ms. Teresa asked Plaintiff Chamba to provide "documents for use in this case." This was done in late 2006. When Ms. Teresa went to her house, Plaintiff Chamba gave Ms. Teresa her son's medical records, which (by omission) contradicted the leukemia claim (Aug. 9 Rector Decl. Exh. 10 at 4–6). The son's medical record (from Carlos Andrada Marin Hospital) showed that his admission date had been October 24, 2002, and the final prognosis stated, "Ambulatory and stable patient, with good general condition upon discharge" (*id.* Exh. 11 at 2). The records listed other ailments unrelated to this action but in no way indicated he had any form of cancer. These records should have been reviewed by counsel before suit, not after suit commenced. Once obtained, the medical records hoisted the warning flags yet higher and, in truth, demonstrated the cancer claim was untrue. Counsel should have followed up promptly and voluntarily dismissed Plaintiff Chamba's claim. Instead, counsel masked the problem by promulgating misleading interrogatory answers.

Beginning in mid-November 2006, discovery responses were due from but were not provided by plaintiffs' counsel. This led to a series of discovery motions. Without revisiting those hearings in detail, it is sufficient to say that plaintiffs' counsel were late, slow and stingy in providing responses. Plaintiffs were also quite inconsistent in their position regarding discovery of the intake forms. In a letter dated December 27, 2006, Attorney Hoffman stated that they were *not* withholding any documents due to privilege (other than a few uncontested and irrelevant items). Later reversing field, however, plaintiffs' counsel provided an untimely

United States District Court
For the Northern District of California

1   privilege log (on February 27, 2007) which identified the "intake forms" as privileged

2   attorney-client work product. The Court eventually held that the late assertion of privilege

3   constituted a waiver of any privilege as to the intake forms, leading to their production.

4        Meanwhile, interrogatory answers fell due. As for Plaintiff Chamba, counsel prepared a

5   discovery response in February 2007 for Plaintiff Chamba. In response to a question asking

6   about physical or emotional injuries she suffered, Plaintiff Chamba stated (Aug. 9 Rector Decl.

7   Exh. 13):

8            I do not know when my son was first injured. The first symptoms
             I saw were in 2002. He did not want to eat anything, he had cold
9            sweat, and he was pale. I took him to the Carlos Andrada Marin
             hospital in Quito where doctors examined him and determined that
10           he was suffering because of pollution. He was diagnosed as
             having been poisoned by pollution, by residuals of hydrocarbons,
11           according to the examinations. Dr. Sandra Samaniego diagnosed
             him.
12
13   Although there was no mention of leukemia, the answer perpetuated the pretense of the viability

14   of the claims in the case rather than coming clean and dismissing the claim.

15        Plaintiff Gonzales also had a February 2007 discovery response prepared and served by

16   her counsel. She stated: "I do not know with medical certainty when I was injured the first time.

17   Now I am in treatment in SOCAL (Guaranda). I was diagnosed with a tumor in my armpit in

18   2006. I am convinced that I suffer from cancer." Her signature was on the form (Aug. 9

19   Rector Dec. Exh. 16). This, too, perpetuated the claim of cancer, although counsel surely knew

     or should have known by this point that Plaintiff Gonzales had no cancer at all.

20        Plaintiff Gonzales' counsel served an amended supplemental response to defendants'

21   first set of interrogatories on May 9, 2007. Plaintiffs' counsel knew by now that the biopsy was

22   benign — there was no cancer. Plaintiff Gonzales modified the foregoing interrogatory answer

23   as follows: "I do not know with medical certainty when I was injured the first time. I began

24   experiencing symptoms sometime towards the end of the year in 2005. In February 2006,

25   the pain was very severe. I had this pain on my right arm that moves to my back and my chest.

26   I also had numbness and weakness in the same arm. At this time, I was diagnosed with a growth

27   in my armpit and also had a biopsy on my right breast in February 2006 at SOCAL hospital with

28   Dr. Manuel Jimenez. I do not remember who the other doctors were. Later in August or

United States District Court

For the Northern District of California

1   September of 2006, I had an ultrasound of my right breast and they found another growth there."

2   This was signed by Plaintiff Gonzales (Sept. 13 Collingsworth Decl. Exh. A).  Counsel knew by

3   this point that there was no cancer and the supplemental answer was a smokescreen to avoid

4   dismissal of a meritless claim.

5       In March 2007, in response to defense counsel's request to produce the "51 percent"

6   letters from Dr. Ribadeneira or other medic who had examined the plaintiffs, plaintiffs' counsel

7   wrote, "No such letter was obtained.  Dr. Ribadeneira was never contacted" (Aug. 9 Rector Decl.

8   Exh. 8 and 9).

9       In April 2007, defendants made another discovery motion claiming that plaintiffs had

10  refused to describe exposure to the alleged carcinogens and had refused to produce the intake

11  forms used by Attorney Bonifaz.  In May 2007, as stated, the Court compelled production of the

12  intake forms, finding that (i) plaintiffs' counsel failed to supply a plausible excuse for the

13  twelve-week delay in providing a privilege log that specifically identified the intake forms;

14  (ii) while plaintiffs' counsel produced other documents, the lengthy delay before they "came

15  clean and admitted the existence of the intake forms was far removed from the larger

16  production"; and (iii) "the dishonorable circumstances surrounding the withholding of the intake

17  forms [were] troubling, namely, the false statements and lame excuses used to stonewall the

18  issue."

19      In May 2007, counsel went to Ecuador and deposed all plaintiffs.  By this point,

20  plaintiffs' counsel surely knew there was no basis for perpetuating the pretense in the pleadings

21  but did so anyway instead of dismissing the claims.  Plaintiff Gonzales was deposed on

22  May 28, 2007.  A transcript of relevant testimony is as follows:

23          Q:    Ms. Jame, isn't it true that the first biopsy that was
                performed on you to see whether you had breast cancer was
24              performed after April 2006?

25          A:    Yes, in 2006.

26          Q:    After the complaint was filed; right?

27          A:    Yes.

28          Q:    And before the complaint was filed, you knew that you did
                not have breast cancer; correct?

13

A:      I had no — I had not been treated by a doctor, no.  Just a
        suspicion, because I was getting dizzy spells.

Q:      So you self-diagnosed yourself with breast cancer; is that
        correct?

A:      That's what I suspected because of the dizzy spells, the
        headache, pains in my body.  Because of the contamination
        they told me that what I had was cancer.

                            *           *           *

Q:      Did you know that you were going to sue Texaco?

A:      Now I do.

Q:      At the time you did not understand that you were going to
        sue Texaco?

A:      No.

Q:      What did you understand was happening?

A:      Since I was not well-informed, I didn't know anything yet.

Q:      Did you authorize anybody to sue Texaco for having breast
        cancer?

A:      No.

                            *           *           *

Q:      Did you tell Ms. Teresa that you had cancer?

A:      At the time, yes.

Q:      Even though it had not been diagnosed; is that right?

A:      Yes.

Q:      Did you understand that Ms. Teresa was going to sue
        Texaco for you for breast cancer?

A:      Yes.

(Aug. 9 Rector Decl. Exh. 14).  In this deposition, she also stated that two months before the

May deposition, she had told other plaintiffs' attorneys, Dennis Pantazis and Othni Lathram, that

the biopsy showed no sign of breast cancer.  As stated, this had occurred *before* the April 2007

interrogatory answer.

       On May 30, 2007, Plaintiff Rodriguez was deposed.  He testified that the paralegal had

only spoken to him for about two minutes, "just to sign those papers."  Defense counsel then

14

asked, "Did you understand that your wife was suing for breast cancer that she claims was diagnosed in 2005?" Plaintiff Rodriguez answered, "No. She didn't have cancer and it wasn't in the breast." He further testified that he never told the paralegal that he had been continuously exposed to cancer-causing toxins released by Texaco, nor did he suffer any physical or emotional injuries. Plaintiff Rodriguez never claimed that he feared getting cancer from Texaco's actions (Aug. 9 Rector Decl. Exh. 17).

Defense counsel deposed Plaintiff Chamba on May 31, 2007. She testified then that her son never had leukemia and that his medical records made no mention of any such illness. Moreover, Plaintiff Chamba testified that she did not authorize her lawyers to sue Texaco on her behalf. No one had informed her that they were going to sue Texaco based on the claim that her son had leukemia (Aug. 9 Rector Decl. Exh. 10).

On August 3, 2007, based on these admissions, the Court granted defendants' motion for partial summary judgment and dismissed the case as to the three foregoing plaintiffs. On August 9, 2007, defense counsel filed a motion for sanctions against plaintiffs' counsel. On September 10, 2007, the Court ordered plaintiffs' counsel Bonifaz, Collingsworth, and Hoffman to show cause why each should not be sanctioned. The Court held a hearing on this matter on September 25, 2007. Although Collingsworth appeared and signed for all, he placed a great deal of weight on what Ms. Teresa told them regarding plaintiffs' alleged cancer. As stated, the Court gave plaintiffs' counsel the opportunity to submit further material, *in camera* as needed. Counsel requested one week. The Court gave him two. The Court has now considered the additional information submitted by plaintiffs' counsel, namely the declarations of "Ms. Teresa" and her attorney son, Eduardo Gallo, who accompanied Ms. Teresa during the interviews of Ms. Chamba.

## ANALYSIS

In relevant part, Rule 11(b) states:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, —

* * *

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Improper filings include those that "are both baseless and made without a reasonable and competent inquiry." *Estate of Blue v. County of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997). That phrasing perfectly captures what happened here. This order finds and holds that the cancer claims made on behalf of the three plaintiffs at issue by Attorney Bonifaz, Collingsworth and Hoffman were baseless and made without reasonable and competent inquiry.[4]

This order finds and holds that, when this action was commenced, counsel knew or should have known (i) that the claims made by plaintiffs Chamba, Gonzales, and Rodriguez were baseless, (ii) that their pre-suit inquiry was neither reasonable nor competent, (iii) that counsel failed to follow up on pre-suit warning flags that spelled trouble, and (iv) that none of the three plaintiffs gave consent to file suit in the United States, much less informed consent.

Over and again, counsel say that they relied on the paralegal's work and had no actual knowledge that the cancer claims were false. Rule 11 requires more. Rule 11 requires "evidentiary support." Rule 11 requires "reasonable and competent inquiry." *Estate of Blue*, 120 F.3d at 995. No counsel of record interviewed or counseled any of the three plaintiffs prior to suit. Attorney Bonifaz knew the landscape, culture and language. He should have personally interviewed and counseled the plaintiffs. Counsel should have learned the factual basis for the cancer claims and made sure the clients understood the ramifications of suing in the

---

[4] Rule 11 is limited to "pleadings, written motions and other papers" filed with the court, not other litigation product. *Christian v. Mattel, Inc.*, 286, F.3d 1118, 1131 (9th Cir. 2002). It is not applicable to disclosures and discovery requests, responses, objections and motions under Rules 26 through 37. *Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 n. 15 (9th Cir. 2001). Here, the Rule 11 sanction would only apply to the complaints and other motions filed with the Court. Although they met the other Rule 11 procedural requirements, defendants failed to comply with the Rule 11 "safe harbor" provision. A motion for sanctions may not be filed until 21 days after it is served. FRCP 11(c)(1)(A). This 21-day period is "absolutely prerequisite" and sanctions cannot be imposed under a motion filed within 21 days after the motion was served, no matter how egregious the alleged misconduct. *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 789 (9th Cir. 2001). Plaintiffs' counsel were correct to point out that defendants failed to provide proper notice to plaintiffs' counsel before filing the their motion for monetary sanctions. The Court, however, can impose sanctions on its own initiative. FRCP 11(c)(1)(B). The Court in this case has issued an order to show cause and provided an opportunity for a hearing and even follow-up supplementation.

United States and actually wished to do so.  Collingsworth and Hoffman knew or should have known how weak was the evidentiary support and that the inquiry was neither competent nor reasonable.  True, going to Ecuador would have been a burden but it was a burden of their own making.  Counsel strategized to sue in the United States on behalf of the indigenous people and indeed, commissioned a search to unearth prospective claimants in the Amazon region.  Having designed an international strategy, they should have followed through with the inquiry required by Rule 11.  Counsel did not.  Nor did they even obtain the items requested in Attorney Bonifaz's letter commissioning the search, never getting, for example, the 51-percent probability letter.  Pure and simple, the pre-suit inquiry was not reasonable and not competent.

Counsel now argues that they "had no basis upon which to question the medical condition of these plaintiffs or representations made regarding the same until they physically traveled to Ecuador, approximately one month before defendants deposed the plaintiffs" (Opp. at 2).

Preliminarily, this statement is untrue, particularly with respect to plaintiffs Chamba and Gonzales.  The warning flags were flying even before the suit was commenced.  Plaintiff Chamba left blank the date of first diagnosis on the intake form.  She had no medical documentation to support the leukemia claim.  The warning flags were flying as well for Ms. Gonzalez.  While her intake form claimed breast cancer, there was no medical support for the claim.  As for Plaintiff Rodriguez, there was no intake form at all.

When Plaintiff Chamba later provided Ms. Teresa her son's medical record, it contradicted any claim of leukemia.  Plaintiff's counsel continued the pretense — instead of doing right and dismissing the claim.  Similarly, Plaintiff Gonzalez received the results of a *favorable* biopsy in August 2006.  She informed her lawyers that she did not have cancer in March 2007.  Yet counsel continued the pretense through artfully worded interrogatory answers.

But more fundamentally, the entire premise of counsel's argument is wrong.  Counsel were obligated to investigate *first* and sue *second*, not the other way around.  Counsel cannot avoid Rule 11 sanctions "by operating under the guise of a pure heart and empty head."  *Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994).  Had counsel conducted a reasonable

United States District Court

For the Northern District of California

1   investigation, they would have easily discovered the baselessness of these cancer claims.

2   Attorney Bonifaz's apologies are appropriate and accepted but beg the question of who should

3   bear the financial burden caused by the Rule 11 violation.  Under Rule 11, the answer is

4   clear:  the violator must do so.

5        This is not to say that a lawyer can never rely solely on a paralegal or a foreign lawyer to

6   gather the necessary evidentiary support for a lawsuit.  Where the clients, however, are as

7   unsophisticated as plaintiffs' counsel have portrayed them throughout this action, where the

8   clients live in a foreign country, where the fact issues are not simple, where so much can be lost

9   in translation, where counsel plans to use them as named plaintiffs in a suit in the United States,

10  counsel have much to ask and much to explain to their clients.  That cannot be delegated to a

11  paralegal, even one accompanied by a foreign lawyer.[5]

12       Turning to a different point, it is true that Rule 11 normally requires a

13  signature:  "Every pleading, written motion, and other paper shall be signed by at least one

14  attorney of record . . . or if the party is not represented by an attorney, shall be signed by the

15  party."  Although Attorney Bonifaz was the driving force, it was Attorney Collingsworth and

16  Attorney Hoffman who physically signed the complaint and amended complaints.

17  Nonetheless, Attorney Bonifaz can still be held accountable.  Pursuant to FRCP 11(b),

18  certification is based on "presenting" papers to the court.  A party "presents" a pleading or other

19  paper "by signing, filing, submitting or later advocating" positions set forth in the original

20  document.  According to the Advisory Committee Notes, Rule 11 sanctions, therefore, may be

21  awarded where an attorney or unrepresented party reaffirms or advocates positions contained in

22  earlier-filed papers after learning such positions are without evidentiary or legal merit.

23  Even though Attorney Bonifaz did not physically sign the complaint and amended complaints,

24  he has been the lead counsel and has accepted responsibility for the snafu.  He is the single most

25  responsible figure for the events in question.

26

27       [5] Ms. Teresa's son accompanied her on the visit to Ms. Chamba.  He was a local lawyer.
    His declaration makes clear they simply accepted Ms. Chamba's statement that her son had cancer.
28  His declaration makes no reference to any medical corroboration or to any advice about civil actions in the
    United States.

18

**United States District Court**

For the Northern District of California

1 Attorney Hoffman claims to have been only "local counsel."  His letter dated

2 December 27, 2006, regarding discovery, criticized in the May 2007 order, is proof that

3 Attorney Hoffman has been more than a mail drop and has had an active and substantive role

4 in this civil action.  At all events, there is no exception in Rule 11 for local counsel.  When he

5 signed the complaint, Attorney Hoffman was under a Rule 11 obligation, as were

6 Attorneys Bonifaz and Collingsworth.  No doubt, he trusted his friend (Attorney Collingsworth)

7 to have done the homework for both of them before he signed the pleading.  A few questions by

8 Attorney Hoffman would have easily laid bare the incompetence and unreasonableness of the

9 pre-suit inquiry.  Asking "How do we know they have cancer" and "Do we have their medical

10 records" would have likely done it.  This order recognizes that the duty of inquiry may vary

11 according to one's role in the case.  But one who *signs* a complaint and launches litigation must

12 honor Rule 11, which was not met in this instance.[6]

13 Under Rule 11, a sanction should be limited "to what is sufficient to deter repetition of

14 such conduct or comparable conduct by others similarly situated."  Plaintiffs' counsel claims that

15 the dismissal order has already imposed a sufficiently severe sanction — dismissal of plaintiffs'

16 claims with prejudice.  That was no sanction.  That was merely wiping away bogus claims that

17 should never have been on the books.  That alone would not stand as a deterrent.  That is

18 insufficient to compensate defendants for the defense expense.  Rule 11 says:  "The sanction

19 may consist of, or include, directives of a non-monetary nature . . . or, if imposed on motion and

20 warranted for effective deterrence, an order directing payment to the movant of some or all of the

21 reasonable attorney's fees and other expenses incurred as a direct result of the violation."

22

23

---

24 [6] This order recognizes that some decisions have cut slack for true local counsel when they have had no active participation in the case and all of the substantive work has been done by out-of-state counsel, especially

25 when time constraints to file have been short, such as one day.  *CTC Imports & Exports v. Nigerian Petroleum Corp.*, 951 F.3d 573, 579 (3d Cir. 1991); *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 103 F.R.D. 124, 125 n.1 (N.D. Cal. 1984) (Schwarzer, J.).  As stated, the record here shows no such confined role for

26 Attorney Hoffman and no such time constraints.  For cases imposing sanctions despite the "local counsel" claim, *see Long v. Quantex Resources, Inc.*, 108 F.R.D. 416, 418 (S.D.N.Y. 1985) (Owen, J.).  The Supreme

27 Court has said that "the signing attorney cannot leave it to . . . one of his partners to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the

28 fact that he has applied his own judgment."  *Pavelic & Leflore v. Marvel Entertainment Group Div. of Cadence*, 493 U.S. 120, 125 (1989) (overruled on other grounds).

United States District Court

For the Northern District of California

1    This order finds that Attorney Bonifaz was the primary lawyer at fault and bears the most

2    responsibility for the team's deficient performance.  But Attorneys Collingsworth and Hoffman

3    likewise signed pleadings without reasonable and competent investigation.  The totality of all of

4    their inquiry was so minimal as to be unreasonable and incompetent.

5    This order finds that defense counsel did incur over eighty-thousand dollars in exposing

6    the baseless claims, the figure being driven largely by the expense and time of having to travel

7    to Ecuador to depose the plaintiff.  The Court, however, need only set an amount that is

8    sufficient to deter repetition of such conduct or comparable conduct by others similarly situated.

9    Taking into account the public interest nature of the lawyers involved and their limited

10   pocketbooks, $45,000 is therefore awarded to defendants.  Attorney Bonifaz must pay the entire

11   amount by the end of this year.  If Attorney Bonifaz does not do so, Attorneys Collingsworth and

12   Hoffman shall pay the unpaid balance by **JANUARY 31, 2008**, each being responsible for half of

13   the unpaid balance.  Attorneys Collingsworth and Hoffman shall be entitled to recover from

14   Attorney Bonifaz reimbursement for all amounts they pay under this order.  All three attorneys

15   shall provide a copy of this order to their respective state bars, provide the Court with a copy of

16   the transmittal letter by **NOVEMBER 2, 2007**, and later advise the Court whether timely payment

17   of the sanction award has been made.[7]

18                              **CONCLUSION**

19   For the above-stated reasons, this order **GRANTS** sanctions against Attorneys Bonifaz,

20   Collingsworth, and Hoffman in the amounts stated above.  This order reiterates that the

21   remaining claims by the remaining plaintiffs will continue to be litigated.  Under no

22   circumstances can counsel attempt to trade off the possibly legitimate claims of the remaining

23   plaintiffs against the sanction awards here.  This order, however, does hereby impose a lien

---

[7] Because Rule 11 is an entirely sufficient basis for the award made herein, this order need not reach the question of sanctions under *Chambers v. PASCO, Inc.*, 501 U.S. 32, 45–46 (1991).

against any interest said counsel may have in any judgment or settlement made in connection with the claims of the two remaining plaintiffs.

**IT IS SO ORDERED.**

Dated:  October 16, 2007.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE